McIlvaine, J.
The first objection urged by plaintiffs in error, defendants below, against the assessment is, that the land upon which Eggleston Avenue was constructed has been appropriated to unauthorized uses.
That the change of use from a canal to a uublie street was *512 within the power of the public authorities, as we understand, is not disputed. And it makes no difference on this point, whether the original use was acquired by grant of a conditional fee, or as a mere easement. Malone v. City of Toledo, 28 Ohio St. 643. But particular reliance is placed on the fact, which defendants below offered to prove, that previous to the making of the improvement, the- city had granted the use of the avenue for railroad purposes, and that such use was afterward enjoyed by the railroad company. This latter change of use is justified on the same principle as the former. True, abutting property owners may have been injured by the change, and for such injury entitled to damages; but, having permitted the change to be made, they are not released from liability to assessment for the improvement of the street—their only remedy now being by action for damages.
2. It is further objected, that the improvement was unauthorized, being in violation of the condition in the grant from the state, to wit: that the right to improve the street depended on the approval of the plan by the state board of public works. This objection is not well taken. The plan of improvement submitted by the city was approved by the board in respect to its general features, The only right which the board.sought-to reserve was the approval or disapproval of details, which might affect the interests of lessees of the water-power. This reservation was not intended for the benefit of the general public or of adjacent property owners; nor could it affect their interests injuriously. And, admitting that the state might have restrained the improvement of this portion of the avenue until such details were examined and settled, it is quite clear, that the state having permitted the improvement to be completed without objection, the general public and adjacent landowners could have no standing to resist the payment of the cost of the improvement out of the general revenues of the city, or by special assessments.
3. It is further contended that those abutting proprietors, within the subdivisions of land by the heirs of Martin Baum and by Clark Williams, are not liable to assessment *513 by reason of tbe conditions in tbe deeds of dedication of tbe strip of land along the southwest side of the canal, and now embraced within the avenue. The condition named in the deed of Baum’s heirs is that such proprietors shall not be be chargeable for an improvement, unless the owners of half the frontage shall express their consent thereto in writing; and, in Williams’ deed, that the expense of such improvement must be paid by those who petition for the same.
In our opinion, these dedications to public use took effect, but the conditions named were inoperative and void. The dedicators undoubtedly intended to make the grant to the public absolute and perpetual, but sought to secure to themselves, their heirs and assigns, quoad other property, an immunity from public burdens, from which it is against the policy of our law that any one should be exempted. The public necessity that streets and highways should be improved and kept in repair, is equal to the necessity for their establishment; and private property can not be exempted from liability to share in the burden of the improvement and repair of highways, any more than it can be exempted from liability to be appropriated for the establishment of a highway, where public necessity demands it. And it is no answer for these parties to say that, when the public accepted the dedications, it assented to the conditions. The public had power to accept the grant, but no power to assent to the conditions proposed. While, therefore, the lands dedicated have become a part of the public street, the proposed exemption of other lands from the public burden of maintaining it are inoperative and void.
4. It is also contended by the property owners on the southwest side of the improvement that their lands do not abut on the improvement, and therefore they are not liable to the assessment.
The street or avenue was graded to the full width of ninety feet, exclusive of slopes. These ninety feet included the canal land, seventy-one feet in width, and nine *514 teen feet of the strip dedicated and condemned on the southwest of the canal, leaving one foot, on the west side of the strip dedicated by Baum’s heirs and others, not included in the surface of the street. But it appears that this foot was occupied by the slopes, both in embankments and excavations. Whether this use of the intervening foot strip extended throughout its entire length, does not, however, appear in the record.
It seems to us that, in order to exempt thfese proprietors from assessment as abuttors on the improvement, it must appear that this intervening foot of land deprives them of full, free, and lawful access to the street improved; but such deprivation could result only when the right and exclusive use thereto have reverted to the original dedicators and their heirs. If the public right to its use still continues, or if the right to the strip has vested absolutely in the owners of lands abutting upon it, after abandonment by the public,.then, in either case, their liability to assessment is certain. That this foot of land, before the improvement of the avenue, was subject to the use of the public, as part of a highway, is not disputed; and we are unable to find any ground upon which it can be held that such right in the public has terminated. The greater part, if not the whole of this foot strip is utilized by the public in making slopes to the embankments and excavations of the street— a use quite as important and germain to public travel and convenience as if located in the center of the street. Our conclusion, therefore, is that whether this strip be or be not, strictly speaking, a part of Eggleston avenue, it presents no hindrance or let to the full, free, and lawful access of these proprietors to the avenue.
5. And, lastly, it is claimed by plaintiffs in error, that the work done by the contractors was not worth twenty-seven and one-half cents per cubic yard. It was conceded on the trial that work of the quality named in the contract, to wit, material of pure earth, sand, gravel, or rock, with no perishable or vegetable matter therein, was worth the contract price. The testimony very clearly shows that, *515 within the fills made on the avenue, a great quantity of very worthless material was placed, such as is described by witnesses as ashes, straw, garbage, rubbish, offal, etc.; but a close examination of the testimony further shows that these worthless materials had been placed on the avenue by the city and others, before the contract of Einnell and Dwyer was made, and that they received no credit therefor in the estimate of their work.
Much is said by counsel about the use of cellar-dirt; but it would be a great mistake to hold that the witnesses thereby meant the cleanings of old cellars, as it is perfectly manifest from the testimony that earth excavated in the making of new cellars was meant.
The only material used by the contractors, not particularly named as proper material in the contract, as shown by the testimony, was bricks and mortar, which it appears are nearly equal in durability and value to anything named in the specifications. On the whole testimony, we are fully satisfied that the court below did not overestimate the value of the materials used by the contractors.
6. The remaining question in the case arises on the cross-petition in error: Did the district court err in deducting from the estimate of the work, 5,000 cubic yards, on account of material placed on the improvement by the city ?
That a great amount of material had been deposited on the avenue before the contractors entered upon the performance of their contract is not disputed; but the testimony of the civil engineer and other witnesses as clearly shows that all such deposits; were excluded from the estimate of the work done by- the contractors.
There was offered in evidence entries from what is called a “Dump Book,” kept by the city, from'which it appears that dirt was being dumped by the city upon Eggleston avenue, from November, 1871, to June, 1875., But upon what part of the street, neither the book, nor any witness, shows. It does appear, however, that the city deposited a great quantity at other points, both, before and after the contract of Ifinnell & Dwyer wqs. performed^ a.U.d it also *516 appears, from the dump book, that during the time this contract was underway, the city furnished to “Finnell” 3,923 loads of dirt, which averaged from one to one and a half cubic yards per load. It is quite probable that these loads furnished the amount of 5,000 cubic yards, deducted by the district court. If this be so, we think the district court was quite wrong in its conclusion of fact; and, if this testimony did not furnish the data upon which the court acted, we have been wholly unable to find the least particle of evidence to justify the deduction.
With regard to the 3,923 loads furnished by the city to “Finnell,” as per dump book, there is no witness who testifies that any part thereof went into the work to be done under the contract with Finnell & Dwyer; while, on the other hand, William J. Dwyer, one of the contractors (Finnell, the other contractor, being then deceased), testified, in relation to the entries in the dump book, as follows: “ On the east side of the avenue Finnell bought a lot of gravel from Mrs. Lucket. lie was to dig out what he wanted and pay her for it, and then he was to have the hole refilled—this did not extend, in the least, into the avenue. Tbe gravel was all taken out beyond the east line of the avenue; the lot was 180 feet front, and ran back 150 to 175 feet; he dug down 10 to 12 feet. In the refilling of it Finnell bought the city dirt; that is charged to him, something less than 4,000 cubic yards, and the city dumped it into that hole together with other dirt. Not one load of it went into Eggleston avenue.”
We are, therefore, constrained to hold, that the finding of the district court, that there had been included in the assessment made by the city, “ 5,000 cubic yards of dirt, of the value of $1,375, which was furnished by the city of Cincinnati, and therefore not chargeable on the property owners,” was contrary to the evidence; and that the sum, thus deducted, should, with interest from December 28, 1875, be added to the assessment so made, and distributed to the abutting lands in proportion to the frontage.

Judgment modified accordingly.